UNITED STATES of America, ex rel.,
Peter GOODSTEIN and Charles
Grossman, Plaintiffs,

v.

MCLAREN REGIONAL MEDICAL
CENTER, Family Orthopedic Realty,
L.L.C., Norman Walter, M.D., Stephen
Burton, M.D., Larry Pack, M.D., Nathaniel Narten, M.D. and Arun Dass,
M.D., Defendants.

No. 97–CV–72992.

United States District Court,
E.D. Michigan,
Southern Division.

Feb. 14, 2002.

672

Michael J. Riordan, United States Attorney's Office, Detroit, MI, for Plaintiffs.

Carol L. Fossee, Gregory R. Lane, Vlcko, Lane, Bingham Farms, MI, Abraham Singer, Pepper Hamilton, Alan G. Gilchrist, Keith J. Soltis, Jennifer K. Garey, Vander Male, Bellamy, Detroit, MI, for Defendants.

## OPINION

DUGGAN, District Judge.

### I. Introduction

In June of 1997, a *qui tam* complaint was filed under seal pursuant to the False

Claims Act, 31 U.S.C. § 3729, *et seq.*, on behalf of the United States ("the Government") for alleged fraud against the Government by Defendants Family Orthopedic Associates, P.L.C. ("FOA"), Family Orthopedic Realty, L.L.C. ("FOR"), and McLaren Regional Medical Center ("McLaren"). On September 8, 2000, the Government filed a Notice of Election to Intervene in this action, and on September 26, 2000, the Government filed a complaint in this action.

The Government later amended its complaint in order to remove FOA as a Defendant, and add the following physicians as individual Defendants: Stephen Burton, Norman Walter, Larry Pack, Nathaniel Narten, and Arun Dass.

FOA, which is no longer a Defendant in this action, is a professional limited liability company that consists of several physicians who provide orthopedic services. Many patients of FOA are candidates for physical therapy. FOA is located at 4466 Bristol Road, Flint Township, Michigan.

FOR is a limited liability company that owns the building where FOA provides its services. Five members of FOA (Defendants Burton, Walter, Pack, Narten and Dass) are also members of FOR. FOR also leases space in that building, known as "Bristol III," [1] to other entities, including McLaren. McLaren, a health care facility located in Flint, Michigan, offers a full orthopedic center with a full complement of in-patient and out-patient services, including physical therapy.

The Government alleges the Defendants participated in a "scheme" whereby, from 1995 to present, Defendant McLaren and the individual Defendants have maintained an improper financial and referral relationship in which McLaren paid the individual Defendants, indirectly through FOR, remuneration disguised as a lease agreement, while at the same time the individual Defendants referred Medicare patients to McLaren. The Government contends that this financial relationship between the parties is in violation of 42 U.S.C. § 1395nn(a)(1), commonly known as "Stark II," and 42 U.S.C. § 1320a–7b, known as the "Anti–Kick–Back Statute."

Under Stark II, if a physician has a specified financial relationship with an entity, the physician may not make referrals to the entity for the furnishing of designated health services. 42 U.S.C. § 1395nn(a)(1). The Anti–Kick–Back Statute prohibits the payment or receipt of remuneration in return for referring individuals for designated health care services. 42 U.S.C. § 1320a–7b.

The Government contends that the lease agreement violates Stark II and the Anti–Kick–Back Statute because McLaren is paying above fair market value lease payments to Defendant FOR and the individual Defendant physicians. [2]

"Safe harbor" provisions with respect to lease arrangements that would otherwise be prohibited apply to both Stark II and the Anti–Kick–Back Statute. Stark II provides that the rental of office space

---

1. "Bristol III" is one of three similar buildings in the same complex. The other two buildings are "Bristol I," located at 4488 W. Bristol Road, and "Bristol II," located at 4444 W. Bristol Road.

2. The Court notes that although initially the Government also alleged that the medical director agreement between Defendant McLaren and Defendant Walter violated Stark II and the Anti–Kick–Back Statute because the director fee paid was above fair market value, counsel for the Government acknowledged during closing arguments on February 4, 2002, that the Government was no longer pursuing this claim. In any event, the evidence presented as to the medical director fee did not persuade this Court that the $25,000 annual director fee paid for one year was above fair market value.

shall not be considered to be a prohibited financial relationship for purposes of the statute if, among other things, "the rental charges over the term of the lease are set in advance, are consistent with fair market value, and are not determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties." 42 U.S.C. § 1395nn(e)(1)(A). For purposes of the Anti–Kick–Back Statute, the term "remuneration" does not include any payment made by a lessee to a lessor for the use of premises, if, among other things, "the aggregate rental charge is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare or a State health care program." 42 C.F.R. 1001.952(b).

On September 12, 2001, Defendant McLaren and the individual Defendants filed a motion for bifurcation of trial pursuant to Rule 42(b) of the Federal Rules of Civil Procedure, asserting that this Court should conduct a separate bench trial on the issue of whether the lease payments paid by McLaren were in excess of fair market value. All parties agreed that although a determination that the lease rate is above fair market value would require trial of the remaining issues, a determination that the lease rate is at a fair market rate would effectively eliminate the Government's claims against all of the Defendants. The Court therefore was persuaded that a determination on the fair market value issue prior to trial on the remaining issues could materially reduce the time required to try this case, and granted the Defendants' motion to bifurcate. (See 10/5/01 Order Granting Defs.' Mot. for Bifurcation).

The bench trial on the fair market value issue began on November 14, 2001, and continued through November 21, 2001. On January 11, 2002, the parties each submitted proposed findings of fact and conclusions of law. Closing arguments were heard by the Court on February 4, 2002. When referencing testimony given at trial, the Court will identify the witness by last name, followed by the applicable volume [3] of the trial transcript, and the relevant page numbers.

## II. Findings of Fact and Conclusions of Law

The Government alleges the Defendants participated in a "scheme" whereby, from 1995 to present, Defendant McLaren and the individual Defendants have maintained an improper financial and referral relationship in which Defendant McLaren paid the other Defendants remuneration disguised as lease payments, while at the same time the Defendant physicians referred Medicare patients to McLaren, and that this financial relationship between the parties is in violation of Stark II and the Anti–Kick–Back Statute because McLaren is paying above fair market value lease payments. As stated *supra*, at this stage the only issue for the Court to determine is whether the lease payments paid by McLaren to the individual Defendants, through Defendant FOR, were above "fair market value."

A. *The Definition of "Fair Market Value"*

Specific definitions of the term "fair market value" are provided for both Stark

3. There are seven volumes of trial transcripts from the bench trial: Volume I: November 13, 2001; Volume II: November 14, 2001; Volume III: November 15, 2001; Volume IV: November 16, 2001; Volume V: November 19, 2001; Volume VI: November 20, 2001; and Volume VII: November 21, 2001.

II and the Anti–Kick–Back Statute Stark II defines "fair market value" as:

> the value in arms length transactions, consistent with the general market value, and, with respect to rentals or leases, the value of rental property for general commercial purposes (not taking into account its intended use) and, in the case of a lease of space, not adjusted to reflect the additional value the prospective lessee or lessor would attribute to the proximity or convenience to the lessor where the lessor is a potential source of patient referrals to the lessee.

42 U.S.C. § 1395nn(h)(3). With respect to rental agreements, a similar definition of fair market value applies to the Anti–Kick–Back Statute:

> the term fair market value means the value of the rental property for general commercial purposes, but shall not be adjusted to reflect the additional value that one party (either the prospective lessee or lessor) would attribute to the property as a result of its proximity or convenience to sources of referrals or business otherwise generated for which payment may be made in whole or in part under Medicare or a State health care plan.

42 C.F.R. § 1001.952(b).

B. *The Lease Agreement Was An Arms Length Transaction*

■ The Court is satisfied that the lease agreement entered into by McLaren and FOR was an arms length transaction.

Prior to leasing space at Bristol III from FOR, McLaren operated a facility that provided physical therapy services in a building located at 5057 W. Bristol Road in Flint Township. (Plue, Vol. III, p. 37). However, McLaren was dissatisfied with that location for various reasons, including:

the only elevator in the building frequently broke down, requiring McLaren to transport physical therapy patients up and down stairs; the non-resident landlord of the building was not responsive to McLaren's needs; the parking lot flooded in the spring; and the parking area was lower than the entrance to the building, which caused McLaren's physical therapy patients to walk uphill toward the building. (Weir, Vol. II, at 87 & 91; Schnegberger, Vol. V, at 112–114). McLaren therefore began looking for a new location in which to offer physical therapy services.

In early 1993, McLaren and FOR began negotiating a lease agreement for space in Bristol III. In a letter dated March 4, 1993, Defendant Walter thanked McLaren for its interest in leasing space in Bristol III and made several initial proposals. (Pl.'s Ex. 1). First, Defendant Walter stated that if McLaren was interested in purchasing his group's physical therapy practice, "we would be asking a sales price of one million dollars." (*Id.*). The letter also stated that "[i]n terms of just leasing space out of the building, we have reached a figure of $18.00 a square foot for either the second or third floor." However, the letter stated that if McLaren required an additional elevator, $20.00 a square foot would be required to help offset the cost of installing the elevator. (*Id.*).

Although McLaren was not interested in purchasing the group's physical therapy practice, it remained interested in leasing space in Bristol III. In a letter dated March 26, 1993, McLaren suggested a gross[4] rental rate of $12.00 per square foot, or triple net[5] lease of $8.50 per square foot. (Pl.'s Ex. 2).

---

4. A "gross" lease is an "all-inclusive lease," in that the tenant does not pay any additional amounts for taxes, utilities or insurance.

5. In a "triple net" lease, the tenant is responsible for paying insurance, taxes, and utilities.

By September of 1993, the parties had agreed on a gross rental rate of $17.00 per square foot. However, the parties continued to negotiate many other terms of the agreement. These negotiations were conducted between the parties and their attorneys. Richard Harris, FOR's attorney, testified that the negotiations were "very intense" and "absolutely arms length." (Harris, Vol. III, at 88).

Although FOR had requested a ten year lease, McLaren preferred a five year lease term. (Pl.'s Ex. 6; Pl.'s Ex. 8). FOR also wanted McLaren to lease 25,000 square feet in the building. (*Id.*).

In regard to the calculation of the square footage in the lease, FOR wanted the space leased by McLaren to be measured by the outside surface of the exterior walls, as it is in most leases. However, McLaren wanted the premises measured from the ·inside surfaces of the exterior walls, rather than the outside surfaces. (Harris, Vol. III. at 83–85).

FOR wanted McLaren to pay rent during the time it renovated the leased space, while McLaren did not want to pay rent during renovations. (Defs.' Ex. 227).

FOR wanted the lease to only provide that FOR would provide parking consistent with governmental requirements. McLaren wanted the lease to provide that FOR would provide parking consistent with the business needs of McLaren. (Harris, Vol. III., at 87–90).

McLaren also desired a lease term providing that McLaren has the right to terminate the lease if FOA moves out of the building. (Harris, Vol. III, at 82, 92). McLaren wanted this provision included because it wished to avoid the problems it had encountered with the off-site landlord at its previous location. (Beckman, Vol. II., at 124).

McLaren had numerous other terms that it desired in the lease agreement with FOR. McLaren wanted: FOR to install an additional elevator in the building; a non-compete clause in the lease, stating that FOR would not provide physical therapy services during the term of the lease; an exclusivity clause in the lease, stating that McLaren would be the only physical therapy provider in Bristol III; a lease with no cap on utilities; a lease with no security deposit paid by McLaren; and a term providing that McLaren would self-insure rather purchase insurance. (Harris, Vol. III., at 82–85, 90–93; Defs.' Ex. 227).

After approximately nine months of negotiations on these issues, McLaren ultimately prevailed on most of its desired terms. (Harris, Vol. III., at 88 & 90). On July 29, 1994, the parties signed the lease agreement. (Pl.'s Exhibit 11). The lease agreement provides the following terms favorable to McLaren: 1) a five year term; 2) leased space of only 21, 315 square feet; 3) although McLaren has the right to use common areas, the leased square footage does not include common areas; 4) the area of the leased premises was measured from the inside surfaces of the exterior walls and the centerline of dividing walls; 5) McLaren is not to be charged rent during renovations; 6) rent is calculated by a gross rental rate of $17.00 times the leased space of 21,315 square feet; 7) the rental rate is to increase at 4% per year; 8) McLaren is required to either purchase liability insurance coverage or may self-insure; 9) McLaren has the option of providing FOR $35,000 in cash, or a $35,000 promissory note, as a security deposit; 10) McLaren is to be the exclusive provider of physical therapy services on the premises; 11) FOR agrees not to own a physical therapy practice within 10 miles of the premises; 12) FOR shall provide parking consistent with governmental requirements and the business needs of McLaren. (*Id.*).

Harris testified that he was not satisfied with the terms of the lease ultimately entered into because FOR did not get any the terms he had suggested be in the lease agreement. (Harris, Vol. III, at 90). However, Harris' client entered into the above lease agreement despite Harris' expressed dissatisfaction with the lease. (*Id.* at 93).

Even after the lease agreement commenced, the parties continued to negotiate over various issues, including the signage on the building, roof leaks, and other maintenance problems. In March of 1994, such unresolved issues actually resulted in McLaren withholding rent from FOR. (Weir, Vol. II., at III; Defs.' Ex. 237 & 238).

## C. *The Rental Rate Set Forth in the Lease Agreement Is Consistent With Fair Market Value*

The Government and the Defendants both offered expert testimony to support their respective positions on the fair market value of the space McLaren leased in Bristol III.

### 1. *The Government's Expert Witnesses*

The Government primarily relied on the expert testimony of Mark R. MacDermaid, who prepared a market rent study for purposes of this litigation, but also relied on prior appraisals done by David Rexroth.

#### a. *Mark R. MacDermaid*

The Government offered the expert testimony of Mark R. MacDermaid ("MacDermaid"). MacDermaid is a partner of Landmark Appraisal Company, a company that conducts real estate appraisals for property tax purposes throughout the state of Michigan. (MacDermaid, Vol. IV., at 134). He has been with Landmark since 1984, but has been doing property appraisals since 1974. (*Id.* at 135).

At the Government's request, in 2001 MacDermaid completed a market rent study for the space in Bristol III leased by McLaren. (Pl.'s Ex. 67). In his market rent study, MacDermaid sought to determine the market rent for general office space in the relevant market area, which he determined to be the "Genesee Valley Commercial area." (*Id.*). MacDermaid's market rent study was based on the rents charged in several buildings he deemed comparable to Bristol III. MacDermaid considered only gross or modified gross leases in his market study. (MacDermaid, Vol. IV., at 37, 146). MacDermaid concluded that the fair market rent for the space, on a gross or modified gross basis, was:

$13.00 per square foot in July of 1994
$14.00 per square foot in July of 1995
$14.50 per square foot in July of 1996
$15.00 per square foot in July of 1997
$15.00 per square foot in July of 1998
$16.50 per square foot in July of 1999
$16.50 per square foot in July of 2000

(*Id.*). MacDermaid concluded that the rental rate paid by McLaren exceeded the fair market rate during each of the years in question.[6]

#### b. *David Rexroth*

The Government also relied on previous appraisal summary reports of Bristol III

---

**6.** MacDermaid offered a chart contrasting the market rents he determined with the rents McLaren actually paid under the lease in question:

| Date | Market Rent | McLaren Rent |
| --- | --- | --- |
| July 1, 1994 | $13.00 | $17.00 |
| July 1, 1995 | $14.00 | $17.68 |
| July 1, 1996 | $14.50 | $18.36 |
| July 1, 1997 | $15.00 | $19.04 |
| July 1, 1998 | $15.00 | $19.72 |
| July 1, 1999 | $16.50 | $19.72 |
| July 1, 2000 | $16.50 | $19.72 |

(*Id.*).

done by David Rexroth ("Rexroth"), that were done for a proceeding before the Michigan Tax Tribunal in 1996, and for estate settlement[7] purposes in 1998. (*See* Pl.'s Exs. 19 & 43).

In his 1996 appraisal summary report prepared for the tax tribunal proceeding, Rexroth opined that the McLaren lease was above market rates. (Pl.'s Ex. 43). However, the tax tribunal was not persuaded by Rexroth's 1996 appraisal summary report, noting that it did not include any market comparables to reflect how he determined a market rent of $12.50 in 1994. (*Id.* at 8).

In his 1998 appraisal summary report, Rexroth again opined that the McLaren lease was above market rates. (Pl.'s Ex. 19). Like his 1996 appraisal summary report, the 1998 report did not include any market comparables to reflect how he determined the market rent. (*Id.*).

### 2. *Defendants' Expert Witnesses*

Defendants primarily relied on expert testimony from Winfield Lafayette Cooper, III, James McGuirk, and Bruce W. Siegel, but also referenced prior appraisals done by others to support their position that the McLaren lease is at fair market value.

The Court notes that the Government has objected to the testimony of Cooper, McGuirk and Siegel on the following grounds: 1) Defendants did not timely produce to the Government expert disclosures of McGuirk, Siegel and Cooper as required by FED.R.CIV.P. 26(a)(2); 2) allowing all three of those experts to testify is repetitive and unfair to the Government; 3) the testimony of these three experts is not admissible because it "does not satisfy the reliability and relevancy considerations of FED.R.EVID. 702 as annunciated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,

509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)." (Joint Final Pretrial Order at 8). The Government has also objected to the admission of Defendants' proposed exhibits numbered 205, 206 and 207, which are the curriculum vitae and reports of those experts, again asserting that these individuals are not qualified as experts. (Vol. VII., at 38–39). As the Court reserved ruling on the admissibility of the above named experts and exhibits until after trial was concluded, the Court will address those issues now.

■ As to the first ground, the Government acknowledged in the Joint Final Pretrial Order that it had reviewed the expert reports of Siegel, received on October 2, 2001, McGuirk, received on October 2, 2001, and Cooper, received on October 16, 2001. (Joint Final Pretrial Order at 8). The Government also acknowledged that each of those experts considered the same fair market value issue and offered similar opinions. (*Id.*). The Court is satisfied that the Government had adequate time to review the disclosures of Cooper, McGuirk and Siegel prior to trial.

■ In regard to the second ground, the Court does not believe that allowing the testimony of all three of these experts is unduly repetitive. In addition, as this is a bench trial, the Court does not believe that allowing the testimony of all three experts is unfair to the Government.

■ The Government's remaining ground is that the testimony of these experts does not satisfy the reliability and relevancy considerations of FED.R.EVID. 702. Rule 702 of the Federal Rules of Evidence provides that:

---

7. Following the death of Dr. Ortman, one of FOR's members, this appraisal was done to assist the group in arriving at an appropriate figure to buy-out Dr. Ortman's share of the business.

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. FED.R.EVID. 702. The Government asserts that the professional experience of Cooper, Siegel, and McGuirk "is limited primarily to buying, selling, and leasing commercial property." (Pl.'s Proposed Findings of Fact & Concl. of Law at 75). "Each of them offered testimony regarding leases and buildings in which they have management experience," but the Government contends "they did not demonstrate sufficient training or experience in a recognized methodology that allows them to synthesize a data base of information concerning leases and convert that information into a valuation opinion." (*Id.*).

The Court is satisfied that Cooper, Siegel and McGuirk each have "specialized knowledge" as to commercial lease rates in Flint Township that will assist the Court in understanding the evidence in this case, and in determining whether the lease at issue is at fair market value. The Court finds that these individuals are qualified as experts by their personal knowledge and experience with commercial leasing,[8] and by their training and education in real estate.[9] The Court is also satisfied that their testimony is based on sufficient facts or data, their testimony is a product of reliable principles and methods, and that they have applied those principles and methods reliably to the facts of this case. While the Court recognizes that each of the experts offered in this case may use slightly different methods and principles, and possess different qualifications, those differences are simply a factor that the Court considers in weighing the value of the testimony given by each of the experts. Accordingly, the Court will admit Defendants' proposed exhibits 205, 206, and 207 into evidence, and will consider the expert testimony of Cooper, Siegel, and McGuirk.

### a. *Winfield Cooper, III*

Winfield Cooper, III ("Cooper") is a licenced real estate broker in the state of Michigan, with significant experience with leases of commercial office space in Flint Township. (Cooper, Vol. V., at 132–136). In a comparative market analysis prepared for Defendants, Cooper concluded that a gross rent of $17.00 per square foot was "within the market range in 1993–1994." (Defs.' Ex. 206 at 5).

Cooper's comparative market analysis looked at both gross and triple net leases. (*Id.*). Cooper testified that gross leases and triple net leases can be compared, by simply subtracting the expenses not included in a triple net lease from a gross lease. Cooper testified that the range of expenses not included in a triple net lease during the relevant time period was $6.42

8. Each of these experts has, over a number of years, engaged in the function of determining market rental rates by examining the rental rates of leases in comparable buildings in Flint Township.

9. These experts all have received specialized training and hold various designations in the real estate industry. For example, Cooper is a licensed real estate broker and is also a Certified Commercial Investment Member ("C.C.I.M.") (Cooper, Vol. V., at 132–136); McGuirk is a licensed commercial real estate broker and is also a C.C.I.M. and a Certified Property Manager (Defs.' Ex. 207); Siegel is a licensed commercial real estate broker and is also a C.C.I.M. (Defs.' Ex. 205; Siegel, Vol. VI., at 70).

to $7.56 per square foot. (Cooper, Vol. V., at 162–63). After subtracting the lower expense amount of $6.42 from McLaren's $17.00 gross rate, Cooper concluded that McLaren's lease rate would be equivalent to a triple net lease rate of $10.58 per square foot (*Id.* at 164). Cooper concluded that in 1994 the market range was $10.00 to $12.00 on a triple net basis. Accordingly, he concluded that in 1994 a gross rate of $17.00, or a triple net rate of $10.58, would have been within the market range. (*Id.*).

Cooper further testified that the annual 4% increase in the rental rate contained in the McLaren lease was reasonable, given that the Consumer Price Index shortly preceding the lease agreement had been running at four to five percent. (*Id.* at 171).

Cooper also explained that certain adjustments must be made to the $17.00 gross rental rate paid by McLaren before that rate could be compared to other leases in the market. Cooper testified that under typical lease agreements entered into in Flint Township, the square footage paid for by the tenant would be calculated in a different manner than was used in the McLaren lease. (Cooper, Vol. V., at 145–151). Therefore, although the McLaren lease states that the rent is $17.00 a square foot, Cooper states that rate is artificially inflated due to the way the square footage in the McLaren lease was calculated, and that it would not be appropriate to directly compare that lease rate with other lease rates in Flint Township. (*Id.*; Defs.' Ex. 206 at 3).

Cooper testified that in Flint Township, square footage in leases is customarily measured from the outside of the wall to the outside of the wall. (Cooper, Vol. V., at 145). Contrary to this norm, the McLaren lease measured the square footage from the inside surfaces of the exterior walls, resulting in 820 less square feet than would normally be included in such a lease. (*Id.* at 146–48).

Cooper further testified that in Flint Township, if a tenant leases an entire floor in a building, as McLaren did in Bristol III, that tenant normally pays rent for common areas on that floor. (*Id.* at 148). He testified that the third floor of Bristol III, rented entirely by McLaren, contains approximately 550 square feet of such common area. (*Id.*). However, unlike most leases, the McLaren lease did not include that square footage.

Thus, in order to receive the same amount of actual space in a comparable building, McLaren would have had to enter into a lease agreement that included 1,370 more square feet than was included in the lease at issue. (*Id.* at 150). Accordingly, Cooper testified that the lease rate McLaren was actually paying under the lease agreement with FOR was $15.97 per square foot on a gross basis. (*Id.* at 150–151). Subtracting expenses of $6.42 from a gross lease rate of $15.97 would yield a triple net rate of $9.55 per square foot. As Cooper testified that the 1994 market range was $10.00 to $12.00 per square foot triple net, this triple net rate of $9.55 would actually be below the market range.

b. *James McGuirk*

James McGuirk ("McGuirk") is a licensed commercial real estate broker who has been working in the Flint market for the past 25 years. (Defs.' Ex. 207). For the past ten years, McGuirk has been directly involved in the management and leasing of approximately 400,000 square feet of commercial space in Flint. (*Id.*).

At Defendants' request, McGuirk reviewed the McLaren lease and compared it to other leases in the market. McGuirk concluded that the $17.00 a square foot gross rental rate charged to McLaren in 1994, which he concludes is approximately

$11.00 to $12.00 a square foot on a triple net basis, was well within the market range in 1994. (*Id.* at 3).

### c. Bruce W. Siegel

Bruce W. Siegel ("Siegel") is a commercial real estate broker whose principal business consists of selling, leasing and managing commercial properties. (Siegel, Vol. VI., at 70). A significant portion of Siegel's current business is in Flint Township, and in 1993 and 1994 the majority of his business was in Flint Township. (*Id.*).

At Defendants' request, Siegel reviewed the market lease rate for Bristol III. He concluded the relevant market area for the space in Bristol III was Flint Township, and concluded that in 1994 the fair market value of the space leased by McLaren ranged [10] from $16.00 to $20.00 per square foot on a gross basis. (Defs.' Ex. 205 at 1). Siegel arrived at that conclusion through his personal knowledge of the Flint Township market, review of several appraisals of the property, and review of a 1993 Genesee County office survey.[11] (Siegel, Vol. VI., at 74–76).

### d. William E. Boring

Defendants also relied on a previous appraisal of Bristol III that was done by William E. Boring ("Boring") in December of 1992 for a construction contractor named Robert Morgan. (Pl.'s Ex. 40). The appraisal indicates that at that time Mr. Morgan, along with "Family Orthopedic Project," was interested in purchasing Bristol III. (*Id.* at 21). Mr. Morgan sought the appraisal because he wanted an opinion as to what the property might be worth if certain renovations were made. (Boring, Vol. VII., at 45). Boring concluded that if space in Bristol III was finished as medical space it would lease for somewhere between $13.00 and $15.00 per square foot on a triple net basis, and that space finished as general office space would lease for $12.00 per square foot on a triple net basis. (Boring, Vol. VII., at 48, 61–63; Pl.'s Ex. 40 at 81).

Boring also prepared an appraisal of Bristol III in August of 1993 for Michigan National Bank.[12] (Pl.'s Ex. 41). At the time of the appraisal, part of Bristol III had been renovated into medical office space and part had been renovated into general office space. (Boring, Vol. VII., at 51). Boring concluded that in August of 1993, market rent of the finished medical space in Bristol III would be $14.00 per square foot and that general office space would be $11.50 per square foot. (Boring, Vol. VII., at 52–53; Pl.'s Ex. 41 at 83). Both of these rates are on a triple net basis. (*Id.*). Boring testified that gross leases can "certainly" be compared to triple net leases, by simply adjusting for the expenses not included in a triple net lease. (Boring, Vol. VII., at 53–54).

### 3. The Court is Not Persuaded by the Government's Expert Witnesses

■ The testimony and reports of MacDermaid and Rexroth do not persuade the Court that the McLaren lease was above fair market value. MacDermaid and Rexroth reached their conclusions by preparing an appraisal or a market rent study. For the reasons that follow, the Court does

10. Siegel testified that in his opinion, in Flint Township a single market rate is not appropriate. Rather, he believes a market rate consists of a range of rates. (*Id.* at 72–73).

11. Siegel testified that this survey indicated what amount of space is available in the entire Genesee County area, including Flint Township, and showed what the general rates were. (Siegel, Vol. VI., at 78).

12. Boring testified that he assumed Michigan National Bank had the appraisal done because they were contemplating placing a mortgage on the property. (Boring, Vol. VII., at 50).

not believe that the market rent study done by MacDermaid or the appraisal summary reports done by Rexroth accurately reflect the market rent of the space McLaren leased in Bristol III.

### a. *Mark R. MacDermaid*

The Court is unpersuaded by MacDermaid's market rent study and testimony for several reasons. Although he acknowledged that triple net leases are more common than gross leases in the market area, unlike the Defendants' experts who considered both gross and triple net leases, MacDermaid excluded all triple net leases from consideration and only used gross or modified gross leases in his market study. (MacDermaid, Vol. IV., at 146; Vol. V., at 37). MacDermaid claims he did not consider triple net leases for his market study because "using such leases would require him to make more adjustments relating to the division of expenses between tenant and landlord than would using gross leases." (Pl.'s Proposed Findings of Fact & Concl. of Law at 43; MacDermaid, Vol. IV, at 56–58, 146–47).

However, contrary to his current position, MacDermaid did *not* exclude all triple net leases from consideration in preparing a 1996 appraisal report of Bristol III that determined market rent for 1994 and 1995 for use in a proceeding before the Michigan Tax Tribunal. (Defs.' Ex. 201; MacDermaid, Vol. IV., 182–184, 186–87). The Court therefore questions MacDermaid's exclusion of all triple net leases from consideration in his current market rent study. By excluding all triple net leases, MacDermaid failed to consider some otherwise comparable buildings because they had triple net leases, such as the buildings commonly known as the Rochelle Center, the Oak Creek Office Park, and the Cornerstone buildings. (MacDermaid, Vol. IV., at 71).

The Rochelle Center is located at 2370 S. Linden Road. Defendants have submitted evidence showing that in 1994 space was leasing in the Rochelle Center for $14.00 per square foot on a modified gross basis. (Defs.' Ex. 243 at 135). MacDermaid testified that when the expenses not included in that lease rate are added, that lease rate is approximately $15.50 on a gross basis. (MacDermaid, Vol. V., at 10–11). However, MacDermaid testified that he did not use leases from this building because "for the most part, it was my understanding that the Rochelle Center is a triple net rent building." (MacDermaid, Vol. V., at 71).

The Oak Creek Office Park is located at 4438 S. Linden Road. Defendants submitted evidence showing that in 1994 space in the Oak Creek Office Park leased at $11.50 per square foot on a triple net basis. (Defs.' Ex. 243 at 137). MacDermaid agreed that rate would be approximately $16.50 to $17.00 per square foot on a gross basis. (MacDermaid, Vol. V., at 14–15). However, MacDermaid excluded leases from this building because they were on a triple net basis. (*Id.* at 71).

The Cornerstone buildings are located at 1325 to 1335 S. Linden Road. (MacDermaid, Vol. V., at 15). Defendants submitted evidence showing that in 1994, space in the Cornerstone buildings leased for $12.40 per square foot on a triple net basis. (Defs.' Ex. 243 at 138). At trial, MacDermaid conceded that rate would be equivalent to over $17.00 per square foot on a gross basis. (MacDermaid, Vol. V. at 17). Although MacDermaid acknowledged that he had access to information concerning leases at these buildings, and that he considered the Cornerstone buildings to be similar in quality to Bristol III, he excluded leases from those buildings because they were not gross leases. (MacDermaid, Vol. at 16–18, 56–57, 71).

MacDermaid's market rent study also used a more restricted market area than the other experts. Rather than use Flint Township as the relevant market area, as the other experts did,[13] MacDermaid used the "Genesee Valley Commercial area" as the market area for purposes of his market study. MacDermaid defined the Genesee Valley Commercial area as: "bounded on the north by Corunna Road, on the west by Dye Road, along the south line is Bristol Road which is really Bristol Road and I–69 expressway, and then along" a portion of the I–75/23 expressway. (MacDermaid, Vol. IV, at 144). However, MacDermaid did not explain why he restricted the market in this manner. Moreover, in his 1996 appraisal of Bristol III for the Michigan Tax Tribunal proceeding, MacDermaid considered buildings outside of the above mentioned boundaries. (*See* Defs.' Ex. 201 at 24).

In addition, testimony given by Siegel persuades the Court that this more restrictive market area was not warranted. Siegel testified that using Corunna Road as the northern border of the market would be "absolutely incorrect and quite frankly, ludicrous" as "there are extremely comparable properties on both sides of Corunna Road." (Siegel, Vol. VI., at 74). Siegel further explained that to use Corunna Road as a separation point in the market would not make sense because "[s]eparation points between markets are typically expressways, railroad tracks, rivers, something that would cause someone not to go across them." (*Id.*). Siegel further testified that generally, a tenant seeking office space South of Corunna Road would be equally seeking space North of Corunna Road. (*Id.* at 75).

As a result of using his restricted market area, MacDermaid excluded some otherwise comparable buildings because they were outside of that market area. For example, MacDermaid excluded all leases from the Cornerstone Buildings and the Beech Hill Centre because they were out of his defined market area.[14]

As stated *supra*, the Cornerstone Buildings, that MacDermaid acknowledged were similar in quality to Bristol III, leased at a rate equivalent to $17.00 per square foot on a gross basis in 1994.

The Beech Hill Centre is located at 3200 Beecher Road. The Beech Hill Centre is of similar quality and location to Bristol III. (Cooper, Vol. V., at 214). Siegel also found the Beech Hill Centre comparable to Bristol III, and used leases from the Beech Hill Centre in his market rent survey. (Defs.' Ex. 205). The leases from the Beech Hill Centre used by Siegel had rents as high as $18.69 per square foot in 1994 on a gross basis. (*Id.* at 6). In addition, David Rexroth, an expert relied on by the Government, prepared a 1994 appraisal for the Beech Hill Centre that determined market rent to be $11.00 per square foot on a triple net basis. (Defs.' Ex. 243 at 82). A triple net rental rate of $11.00 is approximately $17.00 per square foot on a gross basis. (Defs.' Ex. 207 at 3). However, MacDermaid excluded all leases from the Beech Hill Centre, as it was located outside of the market area he defined. (MacDermaid, Vol. V., at 58).

Furthermore, MacDermaid made no adjustments for the unusual way that the square footage in the McLaren lease was calculated. The Court is satisfied that the way the leased space was measured in the McLaren lease (measuring from the inside

**13.** The Court notes that even Rexroth, an expert relied on by the Government, found the relevant market area to be Flint Township. (Rexroth, Vol. IV., at 39).

**14.** The Cornerstone buildings and the Beach Hill Centre are located North of Corunna Road.

of the exterior walls and not including common areas) resulted in the rental rate stated in the McLaren lease being artificially inflated, as explained by Cooper.

The Court also believes that MacDermaid used some questionable "comparables" in his market study. For example, MacDermaid used a building located at 4511 Miller Road, a multi-story building with no elevator, that is not ADA compliant, as a building comparable to Bristol III even though he acknowledged that "some tenants wouldn't be able to use some of the upper floor space." (MacDermaid, Vol. IV., at 151). The 4511 Miller Road Building is also older than Bristol III, and its condition is inferior to Bristol III. (Boring, Vol. VII., at 59–60).

MacDermaid also used 4444 W. Bristol as a comparable even though: that building's parking lot floods because it is located in a floodplain (Cooper, Vol. V., at 154), the building was in foreclosure (Cooper, Vol. V., at 153), and there was no leased space in that building in 1994 because it was entirely owner occupied (MacDermaid, Vol. IV., at 198–99).

In addition, MacDermaid chose 4488 W. Bristol as a comparable even though the majority of that building's parking lot floods (Cooper, Vol. V. at 156 & 158), and the building itself was generally "wet" due to flooding problems with a river. (Plue, Vol., III., at 43–44). In addition, the owner of 4488 W. Bristol testified that as the building was acquired on a "fire sale foreclosure," they do not owe a lot of money on the building, and that the lease rates charged at this building are purposely kept below market for the area to ensure that the building would stay fully occupied. (Defs.' Ex. 250 at 5–6).

MacDermaid also selected 2483 and 2503 S. Linden, collectively known as the Linden Valley Plaza, as comparable buildings. However, Cooper testified that the Linden Valley Plaza is not comparable to Bristol III because: they are older buildings, with low ceilings and smaller windows, that have not been remodeled since their construction in the 1970's, and are not maintained as well as Bristol III. (Cooper, Vol. V. at 139–40). Siegel testified that the Linden Valley Plaza "suffers from functional obsolescence," is not maintained the same way as Bristol III, and is a generally inferior property. (Siegel, Vol. VI., at 91–92.). Harris, who considered leasing space there himself, testified that the Linden Valley Plaza is an older building, is somewhat "run-down," and from a construction standpoint is an inferior property when compared to Bristol III. (Harris, Vol. III. at 105–106).

### b. *David Rexroth*

The Court is also not persuaded by David Rexroth's previous appraisals of the property. As noted *supra*, neither of Rexroth's appraisals included any market comparables to reflect how he determined the market rent of the space leased by McLaren in Bristol III. In addition, during his testimony at this trial Rexroth did not identify the comparables he used in those appraisals. Thus, the Court has no way of evaluating whether Rexroth used appropriate comparables in his appraisals.

Moreover, the Court finds inconsistencies in Rexroth's appraisal reports troubling. In his 1996 appraisal summary report of Bristol III, Rexroth determined the market rent for the leased space was $12.50 per square foot in 1994. (Pl.'s Ex. 18 at 59–60). Rexroth also conducted a complete appraisal for a building located at 2050 S. Linden Road ("the Health Plus Building"), and that appraisal determined the market value as of December 31, 1993 and December 31, 1994. (Pl.'s Ex. 56). The Health Plus appraisal, that identified Bristol III as a building comparable to the Health Plus building, determined that in

1993 and 1994 the market rent was $16.00 per square foot. (*Id.* at 70 & 112). Thus, although Rexroth considered Bristol III and the Health Plus buildings comparable, he determined that in 1994 the market value of one of the buildings was only $12.50 per square foot, while the market value of the other building was $16.00 per square foot.

### 4. The Court Finds the Defendants' Experts More Persuasive

■ The Court finds the expert witnesses relied on by the Defendants to be more persuasive and credible, in various respects, than the experts relied on by the Government. Unlike MacDermaid, Defendants' experts did not unduly restrict the market area under consideration. Rather, Defendants' experts considered leases throughout the greater market area of Flint Township. In addition, unlike Mac-Dermaid, Defendants' experts did not exclude triple net leases from consideration. Rather, they considered both gross and triple net leases from comparable buildings, making adjustments as needed in order to compare triple net leases to McLaren's gross lease rate.

The Court also finds persuasive Cooper's testimony that certain adjustments are necessary in order to appropriately compare McLaren's lease agreement to other lease agreements in the market. Unlike MacDermaid, Cooper considered the unusual way that the square footage in the McLaren lease was calculated and explained that the square footage stated in the lease must be adjusted in order to directly compare the McLaren lease to other leases in the market area.

As stated *supra,* Boring's appraisals of Bristol III, done in December of 1992 and in August of 1993, support the Defendants' position that McLaren's lease was at market rates in 1994. Notably, these appraisals were prepared prior to any litigation concerning the property. That is, they were prepared *before* FOR's appeal to the Michigan Tax Tribunal in 1995, and *before* this action was filed in June of 1997. Accordingly, these appraisals are likely the most objective appraisals before the Court, as the parties seeking and performing the appraisals had no preconceived "positions" in mind with respect to the market rent for the building.

In addition, leases in buildings comparable to Bristol III, that MacDermaid excluded due to either his restricted market area or his exclusion of all triple net leases, were not excluded by Defendants' experts. MacDermaid excluded all leases from the Cornerstone buildings, the Rochelle Center and the Oak Creek Office Park because they were triple net leases, and excluded all leases from the Cornerstone buildings and Beech Hill Centre because they were outside of his restricted market area. However, the experts relied on by Defendants used such buildings as comparables. For example, leases from the Cornerstone buildings were used by McGuirk and Boring, leases from the Rochelle Center were used by Siegel and Boring, leases from Oak Creek were used by McGuirk, and leases from the Beech Hill Centre were used by Siegel. (Defs.' Ex. 205; Defs.' Ex. 207; Pl.'s Ex. 40; Pl.'s Ex. 41). The Court is persuaded that it was appropriate to use these buildings in determining the market rent of Bristol III, as these buildings are all comparable to Bristol III.

Testimony was presented to show that the Beech Hill Centre is of similar quality and location to Bristol III. (Cooper, Vol. V., at 214–15; Defs.' Ex. 205; Siegel., Vol. VI., at 81–82). In fact, MacDermaid himself used leases from the Beech Hill Centre in his 1996 evaluation of Bristol III. (MacDermaid, Vol. IV., at 183).

Cooper also testified that the Cornerstone buildings are comparable to Bristol III. (Cooper, Vol. V., at 214–215). Moreover, even MacDermaid acknowledges that the Cornerstone buildings are similar in quality to Bristol III. (MacDermaid, Vol. V., at 16).

Boring and Cooper testified that the Rochelle Center is comparable to Bristol III. (Boring, Vol. VII. at 57–59; Cooper Vol. V. at 214–15). Furthermore Rexroth, an expert relied on by the Government, has indirectly indicated that the Rochelle Center and Bristol III are comparable.[15]

As McGuirk currently owns it, he is very familiar with the Oak Creek Office Park. (McGuirk, Vol VI., at 9–13). McGuirk testified that Oak Creek is comparable to Bristol III. (*Id.*). Cooper also testified that Oak Creek is comparable to Bristol III. (Cooper, Vol. V., at 214–215). Moreover, MacDermaid used Oak Creek as a comparable building in his 1996 evaluation of Bristol III. (MacDermaid, Vol. IV., at 183–184).

Thus, the Court is satisfied that Defendants' experts properly considered leases from the Beech Hill Centre, the Cornerstone buildings, the Rochelle Center, and the Oak Creek Office Park—buildings that MacDermaid entirely excluded from consideration.

D. *The Government Has Not Established That The Lease Rate Was Determined In A Manner that Took Into Account The Value of Any Patient Referrals*

Although the Government has the burden of establishing that the lease rate was determined in a manner that took into account the value of patient referrals, the Government has presented no such evidence.

The Government suggests that McLaren's demand for the exclusivity and non-compete provisions in the lease agreement somehow shows that the lease rate was "influenced by referrals." (Pl.'s Proposed Findings of Fact & Concl. of Law at 69). The Government also asserts that "[a]s further evidence of the Defendants' consideration of the proximity of the rental space to FOA as a referral source, McLaren negotiated a lease provision which allowed them to vacate the leased space should FOA ever move from the Bristol Road building, which could have deprived McLaren of 'capturing' a steady flow of physical and occupational therapy patient referrals from the FOA doctors." (*Id.* at 70). However, the Court does not believe that any of the above lease provisions constitute evidence that the lease rate was determined in a manner that took into account the value of any patient referrals.

In short, the Government has failed to present any evidence to establish that because of potential patient referrals, McLaren paid a higher rental rate than it otherwise would have paid, or that FOR and the Defendant physicians received a higher rental rate than they would have otherwise received because of any patient referrals that McLaren might receive from the FOA physicians.

### III. Conclusion

For the reasons set forth above, this Court concludes that: 1) the lease agreement between Defendant McLaren and Defendant FOR was an arms length transaction; 2) the lease rate set forth in the lease agreement between Defendant

---

**15.** In prior appraisals Rexroth has identified the Rochelle Center as being comparable to the Beech Hill Centre (Defs.' Ex. 243 at 136), and has identified Bristol III and the Beech Hill Centre as comparables. (Pl.'s Ex. 56 at 112). Thus, if the Rochelle Center and the Beech Hill Centre are comparable, and Bristol III and the Beech Hill Centre are comparable, Rochelle must be comparable to Bristol III.

McLaren and Defendant FOR is consistent with fair market value; and 3) there is no evidence that the lease rate was determined in a manner that took into account the value of potential patient referrals. Accordingly, this action must be dismissed in its entirety. A Judgment consistent with this Opinion shall issue forthwith.